_____
                                        )
CARLI A. TAYLOR,                        )
                                        )
                Plaintiff,              )
                                        )
v.                                      )          Civil Action
                                        )          No. 17-11443-PBS
PATROL OFFICER RYAN MOORE               )
and TOWN OF FALMOUTH,                   )
                                        )
                Defendants.             )
_____)


**MEMORANDUM AND ORDER**

June 6, 2019

Saris, C.J.


**INTRODUCTION**

Plaintiff Carli A. Taylor asserts that Patrol Officer Ryan Moore violated her civil rights under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act during a traffic stop in Falmouth, Massachusetts. She alleges that Moore used excessive force when, after stopping her for suspected drunk driving, he grabbed her arm, pulled her out of the car, put her on the ground, placed his knee on her back, and tased her. She also asserts a claim against the Town of Falmouth for its failure to discipline, train, or supervise its officers. Defendants move for summary judgment, arguing that Moore is protected by qualified immunity and that Taylor presents no evidence to

1

support an allegation that the Town was deliberately indifferent to the rights of its citizens. After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment (Docket No. 56).

**BACKGROUND**

The parties heavily dispute the facts concerning the night in question, but at this stage of the litigation, the Court reviews the record in the light most favorable to the nonmoving party. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).

## I. Drunk Driving

On the night of Tuesday, September 9, 2014, Carli A. Taylor met a friend for dinner at Bobby Byrne's Restaurant and Pub in Mashpee on Cape Cod. She had a beer and ordered dinner. Afterwards, Taylor drove to two other bars. Taylor does not remember the name of the second bar, or how long she stayed there. She does remember driving to the third location, the Añejo Mexican Bistro & Tequila Bar in Falmouth, Massachusetts. At Añejo, Taylor had a margarita. When Taylor left Añejo to drive home, bar employees took down her license plate number and called the police to report suspected drunk driving. Falmouth patrol officers were subsequently dispatched to find her.

Taylor was driving herself home along Route 28 in Falmouth when she observed two bicyclists on her right and had to

"swerve" to go around them. Almost immediately afterwards, Taylor saw blue police lights go on behind her. Docket No. 58-1 at 53:12-18. She pulled over, turned her car off, and produced her license and registration when the officer approached her driver-side window. Patrol Officer Ryan Moore of the Falmouth Police Department asked Taylor if she knew why he had pulled her over, and she said she did not. She lied and said that she was coming from work. After further conversation, Taylor eventually admitted that she had been at Añejo. Taylor knew she was in trouble at the time because she had consumed too much alcohol to drive.

Moore asked Taylor to "step out of the car," at which point Taylor said that she "would like to wait for backup." Id. at 56:4-13. Moore then went back to his cruiser. When Moore returned to Taylor's car, he again requested that she step out of the vehicle and asked Taylor to perform a field sobriety test. At this point Moore's demeanor was "forceful" but he was not "yelling." Id. at 57:3-6. Taylor stated again that she "would wait for backup" before getting out of the car. Id. at 56:4-13; Docket No. 64-1 at 68:22. Moore continued to tell Taylor that she needed to take a field sobriety test, or she would be arrested based on his observations. Taylor continued to refuse to get out of the car without back-up present. Moore went back to the rear of the vehicle and called dispatch to send

another police unit. Moore returned to Taylor's driver-side window and again asked her to get out of the car. And again, Taylor refused. She does not know exactly how many times Moore told her to get out the car during their conversation.

## II. **Use of Force**

Without warning, Moore proceeded to reach in through Taylor's open driver-side window, open the car door, grab Taylor's arm, and pull her out of the car. Once Taylor was out of the car, Moore dragged Taylor to the rear of the vehicle, away from the road. Taylor was not resisting at this point and her feet barely hit the ground. Moore then put Taylor on the ground, face first. Taylor describes being "slammed" into the ground causing her eye to hit a rock. Docket No. 34 ¶ 19[1].

With Taylor prone on the ground, Moore pressed his knee into her back, a position he characterizes as a "full body mount." Docket No. 34 ¶ 19; Docket No. 64 ¶ 101. Moore attempted to get control of Taylor's hands in order to handcuff her. Taylor was screaming for help at this point. Moore ordered her to stop resisting and put her hands behind her back for cuffing. Whenever she attempted to lift her head off the ground, Moore

---

[1] During her deposition, Taylor was asked to confirm whether paragraphs 9 through 46 of her complaint were "true and accurate." Docket No. 72-4 at 155:3-4. She replied that they were "[t]o the best of [her] knowledge" and made one modification to paragraph 14. Id. at 155:5-13. At the hearing, Plaintiff's counsel agreed that the complaint was "verified" with respect to these paragraphs. See also Docket No. 72 at 3.

pushed it back down. Taylor pleaded for Moore to release her, stating that she would do whatever he wanted her to do.

With his knee still on top of Taylor's back, Moore unholstered his taser and threatened to deploy it. Taylor asserts that the "full body mount" position made it impossible for her to comply with Moore's orders. The only thing she could move was her head and hear hands were beside her. Moore told Taylor that if she "didn't shut up he was going to taze [her]." Docket No. 58-1 at 75:22-24; Docket No. 64-1 at 81:8-11. Taylor tried to look back at Moore, but he proceeded to lift her shirt and place the taser's electrodes directly on her back. Moore then deployed his taser in "drive-stun" mode. The parties dispute how many times Moore tased Taylor, with Taylor asserting that she was tased at least two times. Taylor screamed out in pain and then went motionless.

Moore stayed with his knee on Taylor's back, using his body weight to control her until a second officer arrived. At the time of the incident, Taylor was five feet, five inches tall and weighed 125 pounds. Officer Walker arrived at the scene, and the two officers placed Taylor in handcuffs. The officers lifted Taylor off the ground and placed her in the back of a police cruiser, with one officer having to fold her legs into the car in order to close the door because she was unable to do so at that point due to the taser.

The officers transported Taylor back to the police station where she was booked and charged with several offenses. Sergeant Cummings made notes regarding Taylor's injuries. Photographs of her injuries were also taken, which show cuts, scratches, and abrasions on Taylor's arms, shoulders, and right hand. Photos also appear to show four marks on Taylor's back. Taylor refused to take a breathalyzer test and was ultimately released to her mother and sister at 2:00 AM on September 10, 2014.

## III. <u>Aftermath</u>

Later on September 10, Taylor appeared in court and then went to Falmouth Hospital for emergency medical care. Taylor was diagnosed with facial trauma, with additional diagnoses of concussion and headache. Since the incident, Taylor has experienced frequent migraines, headaches, nausea, sound and light sensitivity. In November of 2016, Dr. Deborah Tepper diagnosed Taylor with chronic post-traumatic headaches, which started immediately after her concussion. In March of 2018, Taylor sought evaluation for what she described as near daily headaches and was diagnosed by Dr. John Pettinato with chronic migraines. With respect to the charges against her, Taylor eventually admitted to facts sufficient to make out the charge of driving under the influence, which was continued without a finding.

## IV. **Experts**

### A. **Plaintiff's Medical Expert**

Dr. Gary Stanton conducted a physical examination of Taylor on December 13, 2018 and reviewed her prior medical records, including notes from Drs. Tepper and Pettinato. After his physical examination of the Plaintiff, Dr. Stanton diagnosed her with postconcussion syndrome, migraines, cough/sneeze-induced headaches, and Chiari I malformation. As to the causal relationship for Taylor's headaches, Dr. Station opined: "In my opinion, the incident of 9/09/2014 was causally related to Ms. Taylor's ongoing complaints of posttraumatic headaches, which in her case is a symptom of a postconcussion syndrome." Docket No. 75-5 at 7. He went on to state that Taylor's "postconcussion syndrome [was] unlikely to substantially change in the next year," and that while she complained of "mild memory difficulties," it "does not interfere with activities of daily living." Id.

### B. **Plaintiff's Use of Force Expert**

David W. O'Laughlin, Taylor's use-of-force consultant, has more than 43 years of experience in law enforcement, is a certified master instructor in the use of force, and holds more than 30 additional federal, state, and industry certifications in law enforcement force-related disciplines. After reviewing Falmouth Police Department policies, and reports from the night

of the incident, O'Laughlin stated that "[i]n [his] many years as a defensive tactics instructor[,] [he had] not heard of [a full body mount] and [does] not recognize it as one being taught by the Massachusetts Police Training Committee." Docket No. 64-3 at 4. He opined that "Moore had no legitimate reason to remove [Taylor] from the vehicle, as the vehicle was pulled to the side of the road, was not running and was not creating a hazard. . . . [H]er forceful removal from her vehicle was both unreasonable and unnecessary." Id. As to the tasing, O'Laughlin stated Moore's use of an electronic control device was "both extreme and unnecessary." Id. at 5. However, he conceded that she was only tased once. Id. He explained that "[p]art of defensive tactics training incorporates the practice of de-escalation, using time and distance and the avoidance of physical force." Id. "Officer Moore," O'Laughlin observed, "had called for back-up assistance and yet decided not to wait for that assistance, but instead became involved in actions using a significant amount of force on an unarmed female who at best was offering passive resistance." Id. He continued that tasing "is usually reserved for use on a person who has committed a crime of violence and is presenting a danger or high risk of harm to the officer," and that "committing traffic violations, and being suspected of driving under the influence does not rise to . . . a level of danger to the officer that would result in the use of

such a high level of force." Id. Finally, O'Laughlin concluded that Moore did not act in accordance with the Falmouth police Department's policy on electronic control devices because "[i]t is the policy of [the FPD] to use only that level of force reasonable to control or otherwise subdue violent or potentially violent individuals," and "Taylor could not have posed a threat to Officer Moore or any others, as she was down, on the ground, in a so-called 'full body mount' at the point of being tasered." Id. at 6.

### C. Defendants' Taser Expert

Defendants initially submitted an affidavit from Bryan Chiles, the product compliance manager and former validation test manager of Axon Enterprise, Inc. (formerly TASER International, Inc.), and then submitted a second affidavit after the motion hearing. Chiles is currently responsible for coordinating the testing and certification of Axon's products, and for conducting forensic investigations of Axon's Conducted Energy Weapons (CEW) products. The TASER X2 CEW has two cartridge bays which allow two taser cartridges to be installed at the same time. In his second affidavit, Chiles explained that each cartridge has two electrodes, so that when both cartridges are installed in the taser, the taser has four total electrodes – two in the first cartridge bay and two in the second cartridge bay.

There are two main ways to use a CEW – deploy a cartridge, in which probes are fired at the subject, or drive-stun application, in which the CEW is applied directly to the skin of the subject without deploying the probes. Cartridge deployment is designed to cause neuromuscular incapacitation, where as drive-stun application only affects the sensory nerves of a subject and does not cause a subject to lose voluntary muscle movement. When the front of the X2 CEW is pressed against a subject's skin for a drive-stun application, "four burn marks in the pattern of the four X2 CEW cartridge electrodes may be visible on the skin from a single application." Docket No. 78-4 ¶ 15, at 6.

Chiles assertion that the X2 has four electrodes contradicts the testimony of Detective Christopher Bartolomei, submitted by Defendants prior to the motion hearing. Bartolomei, the certified TASER and defensive tactics instructor for the Falmouth Police Department, stated that the "Arc discharge also allows for an officer to use the X2 in the 'drive-stun' (touch/contact) mode in which electrical impulses are transmitted to an individual superficially through two fixed electrodes on the front of the Taser." Docket No. 58-6 ¶ 13, at 2 (emphasis added).

Turning to the taser log submitted by Defendants, Chiles explains that the X2 CEW automatically records the date, time, and details of each event in its event log (also known as a download report or TASER report). The X2 CEW records "every time the weapon is armed, the trigger is pulled, either ARC switch is pressed to activate the high voltage, the menu is accessed, the time is changed, the safety switch is placed in the safe position," etc. Docket No. 58-6 ¶ 13, at 9. A duration listed in the event log is rounded up to the nearest second, so a duration of 1 second can be anything from less than 0.05 seconds to 1.49 seconds. An "arc" event in the log means one of the X2 CEW's arc switches was pressed for more than 0.25 seconds in which high voltage was activated for both cartridge bays, but neither cartridge was deployed. Id. ¶ 29, at 12. Chiles's analysis of Moore's X2 CEW event log reveals that the arc button activating high voltage was pressed twice during the night, once at 10:54:25 p.m. at the beginning of Moore's shift and again at 11:35:04 p.m. for a recorded duration of one second each. Chiles concludes that "[i]n total, from September 9, 2014 11:00 p.m. to September 10, 2014, 12:00 a.m., this CEW activated to deliver electricity in 'drive stun' (arc) mode for a duration of one (1) second." Id. ¶ 34, at 14.

**LEGAL STANDARD**

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quotation omitted). The moving party is responsible for "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" Rakes v. United States, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting Celotex, 477 U.S. at 325). If the moving party shows the absence of a disputed material fact, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (quotation omitted). "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to

survive summary judgment. <u>Sullivan v. City of Springfield</u>, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted). When ruling on a motion for summary judgment, the court "view[s] the facts in the light most favorable to the party opposing summary judgment." <u>Rivera-Colón v. Mills</u>, 635 F.3d 9, 10 (1st Cir. 2011).

**DISCUSSION**

## I. <u>Civil Rights Claims Against Moore (Counts I and II)</u>

Moore argues that Taylor's excessive force claims under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act fail as a matter of law because he is entitled to qualified immunity. "Qualified immunity affords limited protection to public officials faced with liability under 42 U.S.C. § 1983, 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Raiche v. Pietroski</u>, 623 F.3d 30, 35 (1st Cir. 2010) (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)). The qualified immunity analysis has two prongs: (1) whether the facts that plaintiff has shown make out a violation of a constitutional right, and (2) whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. <u>Pearson</u>, 555 U.S. at 232. These two prongs do not need to be considered in a particular order, <u>see</u> <u>id.</u> at 236, but "both prongs must be satisfied for a plaintiff to overcome a qualified immunity defense," <u>Raiche</u>, 623 F.3d at 35.

## A. Constitutional Violation

"Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person." Raiche, 623 F.3d at 36. "The Fourth Amendment is implicated where an officer exceeds the bounds of reasonable force in effecting an arrest or investigatory stop." Id. Whether the force employed was reasonable under the circumstances is an objective inquiry that is determined "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. Factors to be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007) (quoting Graham, 490 U.S. at 396).

The question is whether a reasonable jury could find that Moore violated Taylor's Fourth Amendment rights through the use of excessive force. See Gray v. Cummings, 917 F.3d 1, 8 (1st Cir. 2019). Viewing the record in the light most favorable to Taylor, and drawing all reasonable inferences in her favor, a reasonable jury could find that the force employed by Moore was constitutionally excessive.

As a threshold matter, Moore had the right to require Taylor to step out of the car. See United States v. Ruidiaz, 529 F.3d 25, 32 (1st Cir. 2008) (holding it is within an officer's authority to order the driver and any passengers out of the car during a Terry stop, and that the officer can do so "as a matter of course" without an "independent fear for his safety"); United States v. Coplin, 463 F.3d 96, 102 (1st Cir. 2006) (noting that "a police officer may, as a matter of course, require the driver of a car lawfully stopped for a suspected traffic violation to step out of his vehicle"). When Taylor refused to leave the car, Moore had the right to use reasonable physical force to remove her. "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. By her own account, Taylor was given multiple chances to comply with Moore's commands, and the amount of force used was proportionate. See Boude v. City of Raymore, 855 F.3d 930, 934 (8th Cir. 2017) ("Officers are justified in using force to remove a driver, whom they believed to be impaired, from his vehicle after he refused to comply with their order to exit." (quotation omitted)). To this point, Moore's actions were not objectively unreasonable in light of the circumstances.

Taylor also alleges Moore used excessive force in taking her to the ground, placing her in a "full body mount," and

tasing her. The Graham factors cut both ways. With respect to the first factor - the severity of the crime - drunk driving is a serious offense, but once Moore pulled Taylor out of the car, she was no longer able to drive away while intoxicated. Moreover, it is not a violent crime like an assault or robbery. See Parker v. Gerrish, 547 F.3d 1, 9 (1st Cir. 2008) ("Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault."). This factor weighs slightly in Defendants' favor. As to the second Graham factor - whether the suspect poses an immediate threat to the safety of the officers or others – Taylor was not an immediate threat to other motorists, bicyclists, or Moore once she was out of the car. There is no evidence that Taylor was threatening Moore once she was out of the car, and a "jury could supportably find that, at the time of the tasing, [Taylor] had been subdued [via a "full body mount"] to a point at which she no longer posed a threat." Gray, 917 F.3d at 9. This factor weighs in favor of Taylor.

With respect to the third Graham factor – whether she was actually resisting arrest - the parties heavily dispute whether Taylor actually resisted arrest while on the ground. Viewing the facts in the light most favorable to Taylor, a reasonable jury could find she was not resisting when Moore dragged her to the

rear of the vehicle and slammed her to the ground before Moore
tased her. Instead, in her version, Taylor was not physically
able to comply with any order to put her hands behind her back
because of the way in which Moore was kneeling on her back in a
"full body mount." Taylor pleaded with Moore that she would do
anything he wanted at that point, and yet when Taylor looked
back at Moore, he proceeded to deploy a pain compliance tool in
"drive-stun" mode. Crediting her account, the Court concludes
this Graham factor weighs in Taylor's favor. Accordingly, the
Graham factors point in conflicting directions.

The parties dispute whether Moore tased Taylor once or
twice. In her deposition, Taylor testified that she remembered
being tased "[a]t least twice." Docket No. 64-1 at 83:16-17. She
has also provided a photo distinctly showing four prong marks on
her upper right back. The record has been confusing on this
point. Initially, Defendants put forward evidence that the
device only had two electrodes. After the hearing on the motion
for summary judgment, Defendants submit that the taser Moore
used on the night of the incident contained four flat
electrodes, not two like some common taser models. Defendants
also submit a taser log, downloaded from the internal computer
of the taser Moore used, indicating that the taser "arc[ed]" –
or was only deployed - once during Moore's encounter with
Taylor. See Docket No. 78-2 at 3. And Plaintiff's expert seems

to concede that the log shows Taylor was only tased once. Defendants argue that based on the record, the court must find that Taylor was only tased once. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). The record, as stated, is still unsettled because the Defendants submitted new evidence post-hearing to which Plaintiff has not had time to reply.

Regardless, even if Taylor was only tased once by a four-pronged taser, based on Plaintiff's testimony, photos, and medical evidence, a jury could supportably find that Moore's decision to take Taylor to the ground, put her in a "full body mount," slam her head into the ground, and tase her was constitutionally excessive. See Gray, 917 F.3d at 9 (holding that a reasonable jury could find that a single use of a taser in drive-stun mode to quell a nonviolent, mentally ill individual who was taken to the ground but refused to comply with order to put her hands behind her back, was excessive force); Parker, 547 F.3d at 9 (finding an intoxicated driver's de minimis resistance to arrest insufficient to justify deploying a taser in order to handcuff him); see also Ciolino v. Gikas, 861 F.3d 296, 298, 304 (1st Cir. 2017) (holding that

18

although the plaintiff had "disobeyed a police order," he "was
not given a chance to submit peacefully to arrest before
significant force was used to subdue him" and, therefore, "an
'objectively reasonable police officer' would have taken a more
measured approach" before forcing plaintiff to the ground
without warning); McCue v. City of Bangor, 838 F.3d 55, 64 (1st
Cir. 2016) ("[E]xerting significant, continued force on a
person's back while that [person] is in a face-down prone
position after being subdued and/or incapacitated constitutes
excessive force." (alteration in original) (quotation omitted)).
While the calculus of reasonableness must embody allowance for
the fact that police officers are often forced to make split-
second judgments, Moore's use of his taser in this case was not
done in a split-second but was a deliberate choice, as evidenced
by his threatening her to be quiet and lifting her shirt to
apply the taser electrodes. Additionally, Plaintiff's expert
opines that Moore's use of the taser under these circumstances
was "both extreme and unnecessary" because Moore "had called for
back-up assistance and yet decided not to wait for that
assistance, but instead became involved in actions using a
significant amount of force on an unarmed female who at best was
offering passive resistance." Docket No. 64-3 at 5.[2]

---

[2] Cf. Parker, 547 F.3d at 9 ("The use of expert testimony is permissible in
assisting the jury in evaluating claims of excessive force.").

**B. "Clearly Established"**

Having sufficiently shown a constitutional violation, Taylor must next show that the right was "clearly established" at the time of the violation. This prong has two parts: "(a) the clarity of the law in general at the time of the alleged violation; and (b) the clarity of the law as applied to the case—in other words, whether a reasonable person in the defendant's shoes 'would have understood that his conduct violated the plaintiff['s] constitutional rights.'" Raiche, 623 F.3d at 38 (alteration in original) (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)). Together, "these steps normally require that, to defeat a police officer's qualified immunity defense, a plaintiff must 'identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment.'" Gray, 917 F.3d at 10 (quoting City of Escondido v. Emmons, 139 S. Ct. 500, 504 (2019) (per curiam)). The case "need not arise on identical facts," so long as it is sufficiently analogous. Id.

The parties provide dueling First Circuit cases as to whether it was clearly established at the time of the incident, in 2014, that Moore's single use of a taser when a subject refused to be handcuffed violated Taylor's constitutional rights. Taylor relies primarily on Parker v. Gerrish, which the First Circuit decided in 2008. In Parker:

> [T]he plaintiff had been stopped on suspicion of
> driving while intoxicated. After the plaintiff failed
> several sobriety tests, the officer tried to arrest
> him. When the plaintiff resisted, the officer drew his
> Taser and ordered the plaintiff to turn around and
> place his hands behind his back. The plaintiff
> complied but clasped his right wrist with his left
> hand. Another officer approached and cuffed the
> plaintiff's left wrist. There was substantial dispute
> about what happened next, but according to the
> plaintiff's account (to which the court was required
> to defer in the posture of the case), he released his
> right wrist, yet was tased anyway.

Gray, 917 F.3d at 12 (citations omitted). The First Circuit held

then "that the police officer could be found to have violated

the Fourth Amendment by tasing an unarmed suspect who, in the

course of an arrest, 'present[ed] no significant active

resistance or threat' at the time of the tasing." Id.

(alteration in original) (footnote omitted) (quoting Parker, 547

F.3d at 10-11).

Defendants argue that Parker is inapplicable to the present

case, and that the First Circuit's recent decision in Gray v.

Cummings should guide the Court. In Gray, a police officer was

dispatched to locate and return a patient who was experiencing a

manic episode and had absconded from a local hospital on foot.

917 F.3d at 6. When the officer located the patient, she swore

at him, refused to return to the hospital, and continued to walk

away. Id. The officer radioed for back-up and continued to

follow the plaintiff on foot, closing the distance between him

and the patient. Id. When the officer was within five feet of

the patient, the patient stopped, turned, clenched her fists, and swore at the officer. Id. The officer grabbed the patient's shirt and took her to the ground. Id. Once on the ground, the officer repeatedly instructed the patient to place her hands behind her back, but the patient did not comply and instead tucked her arms underneath her chest. Id. The officer warned the patient that he would tase her if she did not place her hands behind her back. Id. The patient did not comply, but instead swore at the officer and told him to "do it". Id. The officer tased the patient in drive-stun mode for four to six seconds, at which point the officer successfully handcuffed the patient. Id. at 6-7.

On these facts, the First Circuit held that a reasonable jury could find it was an excessive use of force for an officer to use a taser once, in drive-stun mode, to quell a nonviolent, mentally ill individual who was resisting arrest. Id. at 9, 12. However, the court granted the officer qualified immunity, reasoning that "[b]ased on the body of available case law, . . . an objectively reasonable police officer in May of 2013 could have concluded that [his actions], did not violate the Fourth Amendment." Id. at 12.  In distinguishing Parker, the court stated that Gray was "a horse of quite a different hue" because there was "no indication [in Gray] that [the patient], despite ample opportunity to do so, ever complied with [the officer's]

command to put her hands behind her back." Id. Whereas in Parker, it appeared as if the plaintiff was in the process of complying by releasing his wrist to be cuffed, in Gray, "[e]ven when [the officer] warned [the patient] that she would be tased, she did not comply but, rather, continued cursing and told him to 'do it.'" Id.

Defendants argue Gray indicates Moore would have not known in 2014 that his use of a taser on Taylor violated her Fourth Amendment rights. Docket No. 57 at 13-15. But in so arguing, Defendants fail to view the totality of the facts in the light most favorable to Taylor. Defendants assert that even on the ground, Taylor was resisting arrest and refused to put her flailing hands behind her back, while Taylor states that she could not comply because she was unable to move while prone, on the street, with Moore's knee pinned on her back in a full body mount. Moreover, she claims Moore used excessive force when he "slammed" her body to the ground and then repeatedly pushed her head into the ground, causing a concussion, even after she agreed to do whatever Moore wanted. These are exactly the kind of fact disputes meant for trial. Additionally, the record indicates that Moore simply told Taylor to "shut up" or be tased, but tasing someone for "insolence" qualifies as a clearly established constitutional violation under Parker, while tasing

someone for failing to comply with a direct order to put her hands behind her back shields Moore from liability under Gray.

Finally, it was clearly established in 2010 that "slamming" a slightly built, non-violent drunk driver into the ground when she was not given an opportunity to submit is a constitutional violation. See Raiche, 623 F.3d at 36-38 (holding defendant police officer used excessive force when he tackled a stationary individual who was pulled over for a minor infraction and posed no threat to officer safety).

Because of the unresolved factual disputes regarding Moore's use of force, the claim of qualified immunity is denied without prejudice to its being reasserted at trial after resolution of factual questions.[3] The Court denies Defendants' motion for summary judgment on Count I.

### C. Massachusetts Civil Rights Act (Count II)

Taylor also asserts a claim against Moore under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I. To establish an MCRA claim, a plaintiff "must prove that (1) [her] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the

---

[3] The ultimate question of whether an officer is entitled to qualified immunity is "a question of law, subject to resolution by the judge not jury." St. Hilaire v. City of Laconia, 71 F.3d 20, 24 n.1 (1st Cir. 1995) (quoting Prokey v. Watkins, 942 F.2d 67, 72 (1st Cir. 1991)). However, "[g]enuine disputes concerning material facts must be resolved by the jury, perhaps by special verdict form." Wilson v. City of Bos., 421 F.3d 45, 53 n.10 (1st Cir. 2005) (citation omitted).

Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" <u>Bally v. Ne. Univ.</u>, 532 N.E.2d 49, 51–52 (Mass. 1989) (quoting Mass. Gen. Laws ch. 12, § 11H). So, while the MCRA is the state analogue to 42 U.S.C. § 1983, it is "narrower" than the federal cause of action. <u>Nolan v. CN8</u>, 656 F.3d 71, 76 (1st Cir. 2011).

Where the plaintiff asserts an MCRA claim some courts have held that the plaintiff must establish threats, coercion, or intimidation "<u>in addition</u>" to a constitutional violation. <u>Santiago v. Keyes</u>, 890 F. Supp. 2d 149, 155 (D. Mass. 2012) (emphasis in original); <u>see also</u> <u>Longval v. Comm'r of Correction</u>, 535 N.E.2d 588, 593 (Mass. 1989) ("A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act."). "The majority of courts [in this district] have held that in cases involving wrongful arrests or excessive force, the fact of a Fourth Amendment violation, standing alone, does not give rise to a claim under the MCRA." <u>Ciolino v. Eastman</u>, 128 F. Supp. 3d 366, 380 (D. Mass. 2015) (collecting cases); <u>see also</u> <u>Mercurio v. Town of Sherborn</u>, 287 F. Supp. 3d 109, 123 (D. Mass. 2017).

Defendants argue that they are entitled to summary judgment on Taylor's MCRA claim because she has not shown that Moore's

use of force "was accompanied by a secondary motive or arose from an 'intent to achieve some further purpose of violating one or more of Plaintiff['s] rights, beyond [the] Fourth Amendment right to be free from unlawful searches or seizures.'" Docket No. 57 at 16-17 (alterations in original) (quoting Ciolino, 128 F. Supp. at 381).

Plaintiff responds that Moore threatened, intimidated, and coerced her into giving up her Fifth Amendment right against self-incrimination by ordering her to get out of the car to take a field sobriety test and then forcefully grabbing her and arresting her when she failed to do so. See Docket No. 63 at 20. However, "field sobriety tests do not elicit testimonial or communicative evidence and therefore do not trigger the protections afforded by the Fifth Amendment" or art. 12 of the Massachusetts Declaration of Rights. Commonwealth v. Brennan, 438 N.E.2d 60, 65, 67 (Mass. 1982). Moreover, a driver lawfully stopped does not have the right, under federal or state law, to refuse to perform field sobriety tests. See Commonwealth v. Blais, 701 N.E.2d 314, 318-19 (Mass. 1998). So, as discussed above, there is neither an underlying constitutional violation for excessive force in removing Taylor from the car nor evidence that Moore was threatening, intimidating, or coercing her in order to achieve an additional constitutional violation.

Therefore, the Court allows Defendants' motion for summary judgment on Count II.

## II. <u>Civil Rights Claim Against the Town (Count III)</u>

Taylor asserts that the Town of Falmouth's failure to train, supervise, and discipline its officers created an atmosphere in which use of excessive force was tolerated, and that such a de facto policy was the moving force behind the violation of her rights. Prior to the September 2014 incident, Moore received use of force training in 2013. In the spring of 2014, a citizen complaint was reported against Moore for discourtesy and racial bias. An internal affairs investigation exonerated Moore on the racial bias claim but sustained the claim for discourtesy and Moore was provided with verbal counseling. Between January 2010 and March 2018, Moore did not receive a citizen complaint against him alleging excessive force. Over this same time period, there were nine complaints made to the Falmouth Police Department regarding excessive force, assault and battery, or use or force. Each was investigated by internal affairs, which sustained one of the complaints resulting in verbal counseling. From 2011 to 2014, there were nine complaints of harassment made against the Falmouth Police Department, twenty-three complaints of discourtesy, and sixteen complaints of conduct unbecoming an officer.

A plaintiff may bring a § 1983 claim against a municipal entity "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" on the plaintiff. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). To succeed, the plaintiff must show that "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385 (1989).

A claim for failure to train "can be actionable where 'the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact' and where 'the identified deficiency in a city's training program [is] closely related to the ultimate injury.'" Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 26 (1st Cir. 2005) (alteration in original) (quoting City of Canton, 489 U.S. at 388, 391). Plaintiff does not identify a deficiency in the Town's training program. Moore was given use of force training in 2013, and Taylor has not shown that the training was lacking. See City of Canton, 489 U.S. at 391 ("[F]or liability to attach . . . the identified deficiency in a city's training program must be closely related to the ultimate injury. . . . Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?"); see

also <u>Young</u>, 404 F.3d at 27 ("[A] training program must be quite deficient in order for the deliberate indifference standard to be met . . . ."). And the citizen complaints would not have reasonably put Falmouth on notice that its use of force training was subpar. There is no evidence that the Town was deliberately indifferent to the rights of its citizens.

As to the allegation that Falmouth failed to properly discipline its officers, Taylor has not shown that the Town was deliberately indifferent to the rights of citizens. For eight years, between January 2010 and March 2018, Moore did not receive one citizen complaint alleging excessive force. And over that same time period, there were only nine complaints made to the Falmouth Police Department regarding excessive force, assault and battery, or use of force. Each was investigated with one being sustained, and the Court cannot, from these complaints alone, draw an inference that Falmouth was indifferent to the behavior of its officers. Taylor provides a compilation of citizen complaints between 2011 and 2014, and while it shows that some officers have been accused of harassment quite frequently, it also shows Falmouth's internal affairs officers actually sustained a fair number of claims against officers in 2013 and 2014 leading up to the incident, resulting in various disciplinary actions. Additionally, when complaints were lodged against Moore in the spring of 2014, internal affairs sustained

one claim of discourtesy and provided verbal counseling. On these facts, Taylor has not shown that Falmouth was deliberately indifferent to its officers' behavior with respect to use of force. Therefore, the Court grants Defendants' motion for summary judgment with respect to Count III.

### ORDER

For the reasons stated, the Court **ALLOWS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment (Docket No. 56). SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge